# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CAESAR HANSON, JR.**
            **Plaintiff,**

            **v.**                                      **Case No. 10-C-0684**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
            **Defendant.**

## DECISION AND ORDER

Plaintiff Caesar Hanson applied for social security disability benefits, alleging inability to work as of July 1, 2006 due to a combination of physical and mental impairments, including depression, pancreatitis, high blood pressure, HIV, and diabetes. (Tr. at 151-58, 185-96.) The Social Security Administration ("SSA") denied the application initially (Tr. at 79-80, 83-90) and on plaintiff's request for reconsideration (Tr. at 81-82, 91-99), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 63). The SSA's Appeals Council declined to review the ALJ's determination, making it the SSA's final decision for purposes of judicial review. See Allord v. Astrue, 631 F.3d 411, 413 (7th Cir. 2011). Plaintiff now seeks such review pursuant to 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

In determining whether a claimant is disabled, the ALJ must apply a sequential, five-step test, asking (1) whether the claimant is unemployed; (2) whether the claimant has a severe

impairment;[1] (3) whether the claimant's impairment meets or equals one of the impairments considered presumptively disabling in SSA regulations;[2] (4) whether the claimant, given his residual functional capacity ("RFC"),[3] is unable perform his past relevant work; and (5) whether the claimant is unable to perform any other work in the national economy. See, e. g., Simila v. Astrue, 573 F.3d 503, 512-13 (7th Cir. 2009). An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled. A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).

The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work. See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The agency may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age,

---

[1]An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);1521(a).

[2]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[3]RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p. In determining RFC, the ALJ must consider all of the relevant evidence, including treatment records, medical source reports, and the claimant's statements about his impairments and limitations, then provide a narrative discussion describing how the evidence supports his conclusions. SSR 96-8p.

2

education, and work experience. See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 953 (E.D. Wis. 2007).

The court does not, on § 405(g) review, reconsider disability under the five-step test; rather, the court determines whether the ALJ's decision followed the correct legal standards and was based on "substantial evidence." See, e.g., Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004); Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010); see also Schmidt v. Astrue, 496 F.3d 833, 841-42 (7th Cir. 2007) (explaining that substantial evidence must be more than a scintilla but may be less than a preponderance). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ, Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997), and his decision to deny the claim, if adequately explained, must be upheld, Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The court reviews the record as a whole, but it may not decide the facts anew, re-weigh the evidence, re-determine credibility, or otherwise substitute its judgment for that of the ALJ. See, e.g., Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009); Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000).

## II. FACTS AND BACKGROUND

The record in this case contains plaintiff's treatment records dating back to 2006, including a report from his treating physician; the reports of several consultants who evaluated plaintiff's application at the initial and reconsideration levels; and the transcript of the hearing conducted by the ALJ. I first review the evidence and summarize the ALJ's decision before turning to plaintiff's specific assignments of error by the ALJ.

## A.    Treatment Records

On June 18, 2006, plaintiff was admitted to the Aurora Sheboygan Memorial Medical Center with acute alcohol intoxication and diagnosed with pancreatitis and chronic alcoholic hepatitis.  Plaintiff admitted drinking at least a fifth of vodka per day, but drank a little harder the day before his admission.  He complained of abdominal pain radiating to the back and associated with nausea, but no vomiting.  Doctors provided IV fluids and morphine, and consulted Dr. Rana Sokhi for care for plaintiff's pancreatitis and alcoholic hepatitis.  Dr. Sokhi noted two past hospitalizations for pancreatitis, agreed to admitting plaintiff on this occasion, and spent considerable time with plaintiff advising him not to drink alcohol in the future.  (Tr. at 336-47.)

On August 30, 2006, plaintiff saw Dr. David Phelan regarding his recent (May 2006) HIV diagnosis, complaining of fatigue, pain, depression, diarrhea, insomnia, and "just feeling down." (Tr. at 251.)  Plaintiff reported drinking one to two fifths of vodka per day, as well as a six pack of beer, and stated that he worked on a factory assembly line.  (Tr. at 251.)  Dr. Phelan ordered further tests, prescribed Zoloft for depression and Ambien for insomnia, and told plaintiff that he had to stop drinking before they would consider antiretroviral therapy for the HIV.  (Tr. at 252.)  Plaintiff returned to Dr. Phelan on September 13, and the doctor provided samples of Lexapro for depression, as plaintiff could not afford the medication previously prescribed.  Dr. Phelan again strongly encouraged plaintiff to stop drinking.  (Tr. at 255.)

On May 23, 2007, plaintiff went to the emergency room, complaining of vomiting and diarrhea.  He stated that he had just completed a six month jail term, and in the two seeks since his release he had been drinking at least a six pack of beer and half pint of hard liquor per day.  (Tr. at 333.)  Doctors performed tests, diagnosed acute alcoholic gastritis, and

4

discharged him home. (Tr. at 334.) Plaintiff saw Dr. Phelan the next day for follow-up of his HIV, and the doctor found that plaintiff did not, at that point, require antiretroviral therapy and should return in three months for repeat labs. (Tr. at 256, 374.)

On June 26, 2007, plaintiff was again admitted to Aurora Sheboygan Memorial Medical Center with back and abdominal pain and diagnosed with alcoholic pancreatitis secondary to alcohol abuse. Doctors also noted that he was mildly neutropenic and anemic, related probably to both alcoholic myelosuppression and his HIV status. Plaintiff had seen Dr. Phelan for his HIV but was determined not to be a candidate for antiretroviral therapy until his alcoholic liver disease improved. He was treated conservatively with IV fluid, GI rest, and pain control, resulting in gradual improvement, and discharged on July 2, 2007, with medications for hypertension, depression, and gastritis. (Tr. at 262-63, 311-32.) A June 27 CT scan revealed mild acute pancreatitis and/or early acute pancreatitis. (Tr. at 348.)

Following his discharge, plaintiff was referred to Sheboygan County Health and Human Services – Division of Community Programs for out-patient substance abuse treatment, and on July 11, 2007, he met with Ralph Radey, CSAC. Plaintiff stated that he had never had an extended period of time on his own where he stayed clean and sober, and had never completed a treatment program after detox. (Tr. at 283-84.) Radey diagnosed poly-substance dependency, a history of alcohol induced pancreatitis, with a GAF of 55 to 60,[4] and listed goals

---

[4]"GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

5

for plaintiff of remaining abstinent, developing a support system by attending AA, and developing a recovery and relapse prevention plan.  (Tr. at 281-82, 286, 393-96.)

On July 16, 2007, plaintiff saw Dr. Robert Wenberg, his primary care physician, in follow-up after his recent hospitalization.  Since being released from the hospital, he had been abstinent from alcohol but continued to abuse marijuana.  He reported some back pain but no further abdominal pain.  He was able to eat without nausea or vomiting.  He was to begin AA treatment the next day and had no other concerns at that time.  Dr. Wenberg referred plaintiff to Dr. Sokhi for his alcoholic liver disease and further recommendations for treatment.  Dr. Wenberg stated that abstinence was the "cornerstone of any therapy going forward at this time."  (Tr. at 376.)

On July 30, 2007, plaintiff saw Dr. Sokhi, complaining of intermittent abdominal pain, occasionally radiating to the back.  He also complained of feeling fatigued, but denied nausea, vomiting, or diarrhea.  He reported a fair appetite and abstinence from alcohol since his July 2 discharge from the hospital.  (Tr. at 378.)  Dr. Sokhi assessed chronic pancreatitis, stressed the need for sobriety, continued medications for reflux, provided Vicodin for pain, and ordered various tests.  (Tr. at 379-80.)

On August 29, 2007, plaintiff was re-admitted to the hospital as an emergency detention under Wis. Stat. ch. 51 after making suicidal statements, ingesting alcohol, and overdosing on Ambien.  (Tr. at 302, 304-06; see also Tr. at 219-20, court records re: the chapter 51 proceeding.)  Dr. Clint Norris diagnosed alcohol dependence; mood disorder, not otherwise specified; and rule out major depression v. bipolar disorder, with a GAF of 40.  He ordered in-patient psychiatric treatment, detoxification, and AODA treatment.  Dr. Norris also discontinued Zoloft and Ambien, switching plaintiff to Fluoxetine and Trazodone.  (Tr. at 303.)  Plaintiff was

6

discharged on August 31, with a GAF of 55, noting no adverse effects from the new medications and improved sleep. Detoxification resolved without sequelae,[5] and he continued to improve with no relapsing suicidality. He agreed to continue out-patient treatment modalities of AA support groups, treatment through the Department of Human Services, and psychotropic monitoring, and medical supportive treatment of his HIV infection. (Tr. at 300.) Plaintiff also saw Dr. Phelan, who noted that plaintiff needed to be started on antiretroviral therapy for HIV, and that it was mandatory that he stop drinking to be effectively treated. (Tr. at 309.)

On August 31, 2007, plaintiff saw Dr. Mitchell Weinstein regarding his HIV infection. Plaintiff denied suicidal intent and claimed to be taking Zoloft appropriately. He did complain of significant epigastric and back pain related to his chronic pancreatitis, for which he took analgesics regularly. He denied nausea, vomiting, or diarrhea. He remained somewhat anxious, with intermittent palpitations and chest discomfort, which the doctor found likely anxiety related. (Tr. at 381.) Dr. Weinstein stated that given recent testing, plaintiff should be started on antiviral medications related to his HIV infection and provided Atripla. (Tr. at 382.) He also prescribed Vicodin to take as needed for pain related to pancreatitis. He further diagnosed depression and anxiety, hypertension, and a history of asthma. (Tr. at 383.)

On October 30, 2007, plaintiff saw Dr. Daniel Knoedler, staff psychiatrist with Sheboygan County Health and Human Services, complaining of depression. He reported that he had been depressed for years, but more so because of his HIV. He stated that he currently took Prozac and Trazodone but remained quite depressed. (Tr. at 397.) On mental status exam, plaintiff appeared coherent, with moderately depressed mood, clear thought content, fully oriented with

---

[5]Sequelae are conditions following as a consequence of a disease. Stedman's Medical Dictionary 1622 (27th ed. 2000).

no memory problems, fair to poor insight but intact judgment, and no thoughts of self-harm. (Tr. at 398.) Dr. Knoedler diagnosed poly-substance dependence, recurrent major depression, and a GAF of 50 to 60. Dr. Knoedler increased plaintiff's Prozac dosage and continued Trazodone at night. (Tr. at 399.)

On December 6, 2007, plaintiff was seen at the Aurora Sheboygan Memorial Medical Center emergency department for low back pain following a fall on the ice. Doctors provided pain medication and discharged him home in stable condition. (Tr. at 489-92.)

On December 18, 2007, plaintiff saw Dr. Dhiraj Kotwal regarding his HIV infection. Plaintiff reported being free from alcohol use for the past four months. He did have issues with depression, for which he took Prozac and Trazodone, which helped a little, although he still reported getting very anxious and tense during the day. He was stable regarding the HIV, taking Atripla as directed with no side effects. He also reported a growth on his right foot, which caused pain and discomfort with pressure. He reported no nausea, vomiting, or diarrhea, and no abdominal, muscle, or joint pain. (Tr. at 486.) Dr. Kotwal diagnosed chronic HIV infection, anxiety and depression, and right foot plantar wart. He continued Atripla for the HIV, and told plaintiff to continue Prozac and Trazodone for the depression. He also provided a prescription for Xanax for break-though anxiety. (Tr. at 487.) For the plantar wart, he referred plaintiff to Dr. William Houdos in podiatry. (Tr. at 488.)

On January 4, 2008, plaintiff saw Dr. Sokhi regarding abdominal pain and constipation. Plaintiff denied alcohol consumption since August 2007. He complained of abdominal pain in the epigastric and umbilical areas, radiating to the back. (Tr. at 483.) He also requested Dr. Sokhi fill out a form for his disability application. Dr. Sokhi agreed to fill out the form, recommended small meals, and started plaintiff on stool softeners to keep him regular. (Tr.

8

at 484.)

On January 6, 2008, Dr. Sokhi completed a chronic pancreatitis medical assessment form, indicating that he had treated plaintiff for that condition since 2002. He listed symptoms of recurrent nausea/vomiting and radiation of abdominal pain to the back. As clinical findings and test results, Dr. Sokhi noted a May 4, 2005 CT scan revealing pancreatitis. (Tr. at 430.) He indicated that plaintiff did not currently abuse alcohol or street drugs (and had not since August 2007). (Tr. at 430-31.) He nevertheless indicated that even if he assumed plaintiff could maintain complete sobriety, plaintiff would still exhibit the symptoms and limitations discussed in the report. Dr. Sokhi opined that plaintiff constantly experienced symptoms that would interfere with the attention and concentration needed to perform even simple work tasks. He further opined that if placed in a competitive job, plaintiff would be unable to handle public contact, routine repetitive tasks at a consistent pace, and detailed or complicated tasks. He identified drowsiness/sedation as side effects of plaintiff's medication. (Tr. at 431.) Regarding plaintiff's functional abilities, Dr. Sokhi indicated that plaintiff could walk two blocks without rest or severe pain; sit for ten to fifteen minutes before he had to lie down; stand ten minutes before he had to sit down; and sit for less than two hours in an eight hour work day. (Tr. at 431-32.) Dr. Sokhi further opined that in addition to three unscheduled bathroom breaks during the day, plaintiff required about five additional breaks per day to lie down and rest, with such breaks lasting one hour, due to the symptoms of nausea/vomiting, pain, and chronic fatigue. (Tr. at 432.) He indicated that plaintiff could occasionally lift less than ten pounds and would likely be absent more than four days per month due to his impairments. (Tr. at 432-33.)

On January 9, 2008, plaintiff saw Dr. Hodous regarding the painful lesion on his right foot. Dr. Hodous debrided the area, removed the hyperkeratotic tissue, and advised plaintiff

to use lotions to soften the area.  (Tr. at 481.)  If the problem recurred, plaintiff was to return for further debridement and acid treatment.  (Tr. at 482.)

On January 15, 2008, plaintiff saw Dr. Kotwal regarding his HIV infection, with the doctor noting him to be stable and tolerating antiretroviral medication well.  Plaintiff indicated that the Alprazolam Dr. Kotwal had provided for anxiety seemed to be helping.  Otherwise, he was noted to be stable and doing well.  He denied any nausea, vomiting, diarrhea, or abdominal pain.  On exam, Dr. Kotwal found him awake, alert, with normal mood and affect.  (Tr. at 478.)  Dr. Kotwal continued plaintiff on Atripla for HIV, advised him to watch his diet and lose weight, and refilled Alprazolam for anxiety.  (Tr. at 479.)

On March 4, 2008, plaintiff called Dr. Sokhi's office stating that he was having back pain and requesting a refill of Vicodin.  Dr. Sokhi refilled the medication and referred plaintiff to pain management.  (Tr. at 477.)

On March 18, 2008, plaintiff returned to Dr. Hodous regarding the lesion on his right foot, which caused pain with pressure.  Dr. Hodous diagnosed porokeratosis of the right forefoot, debrided the area with a scalpel, and treated it with Salicylic acid.  (Tr. at 475.)

On April 8, 2008, plaintiff saw Dr. Weinstein regarding his HIV infection, doing well on his medication.  Plaintiff did report feeling slightly sleepy after taking the medication, and the doctor instructed that this is why the pills should be taken in the evening before bed.  Plaintiff denied any abdominal pain, nausea, vomiting, diarrhea, fever, or chills.  Dr. Weinstein noted plaintiff's medical history of asthma, depression, hypertension, and previous alcohol-related pancreatitis and hepatitis.  Plaintiff claimed to have quit alcohol completely since the August 2007.  (Tr. at 472.)  On exam, plaintiff appeared quite well and healthy.  Dr. Weinstein concluded that plaintiff was having excellent response to his HIV medication, encouraged him

10

to continue abstinence from alcohol, and noted him to be stable on his depression medication. (Tr. at 473.)

On May 13, 2008, plaintiff saw Dr. Steven Santino for complaints of left chest wall and back pain. Plaintiff stated that the pain had been present for at least six years. Plaintiff noted that he saw Dr. Sokhi for a history of pancreatitis and was unclear whether his pain was solely due to pancreatitis or if there was some other physical component. He described the pain as 8 on a 0-10 scale. The pain worsened with bending forward and improved with a change in positions. He stated that the pain limited him from doing housework. He had been on Hydrocodone, which he did not find all that helpful. (Tr. at 464.) He stated that he was applying for disability, and his pain prevented him from walking, doing housework, and outside work. On exam, Dr. Santino noted some tenderness on palpation at the mid-line of his lumbar spine. However, plaintiff was able to ambulate with normal gait, and do both toe and heel pushups. (Tr. at 465.) His lumbar range of motion in flexion was approximately 80 degrees because of left abdominal discomfort, and extension was limited because of back pain. (Tr. at 465-66.) Dr. Santino ordered x-rays of the thoracic and lumbar spine and prescribed physical therapy. (Tr. at 466.) The x-rays reveal a normal lumbar (Tr. at 468) and thoracic spine (Tr. at 470).

Plaintiff returned to Dr. Hodous on May 20, 2008, for further treatment of the lesion on his right foot. Plaintiff had missed his scheduled follow-up after his March 18 treatment, and the lesion had again become painful. Dr. Hodous again debrided and applied acid to the area. (Tr. at 462.) Plaintiff missed his June 20 follow-up, returning to Dr. Hodous on July 3. Dr. Hodous fully debrided the area, but applied no acid. He explained to plaintiff the importance of keeping his return appointments so they could try to eliminate the lesion long term. (Tr. at

459.)

On July 8, 2008, plaintiff saw Dr. Carlo McCalla regarding his HIV infection, doing very well on Atripla. (Tr. at 456.) He reported no abdominal pain, nausea, vomiting, or diarrhea. Dr. McCalla noted that plaintiff received psychiatric medications from two different providers – Fluoxetine from his psychiatrist and Alprazolam from his infectious disease physician. Plaintiff asked Dr. McCalla to increase the Alprazolam dosage, but the doctor told him to speak to his psychiatrist about that. Dr. McCalla further stated that he was suspicious about plaintiff's medications; plaintiff was on Vicodin and Alprazolam, which Dr. McCalla did not believe he really needed; and plaintiff's girlfriend, with whom he lived, also took Alprazolam and narcotics. Dr. McCalla indicated that he would call Dr. Knoedler and discuss plaintiff's use of Alprazolam, and told plaintiff that in the future he should request it from his psychiatrist. (Tr. at 457.)

On September 5, 2008, plaintiff saw Dr. Sokhi, reporting sobriety for over a year, doing very well, and regularly attending AA meetings. He used Vicodin for chronic pancreatitis, which kept his pain under control. (Tr. at 453.) He complained of no symptoms other than gas and bloating related to reflux. (Tr. at 453-54.) Dr. Sokhi switched plaintiff from Prilosec to Nexium for reflux, prescribed Ambien for sleep, and Vicodin as needed for pain. (Tr. at 454-55.) Plaintiff was to follow-up in six months, sooner if needed. (Tr. at 455.)

Plaintiff returned to Dr. Hodous on October 7, 2008, regarding his foot lesion, with the problem recurring about one month after his last treatment. Dr. Hodous debrided and applied acid to the area. (Tr. at 451.)

On October 16, 2008, plaintiff visited urgent care complaining of swelling in the perianal skin on the left side. Dr. Martha Taran diagnosed a perianal abscess and referred plaintiff to general surgery to have it excised and drained. In the meantime, she prescribed Vicodin to be

used every four to six hours as needed for pain. (Tr. at 449.) Dr. Charles Black drained the area and advised plaintiff to perform warm soaks at home. (Tr. at 447.)

On October 30, 2008, plaintiff returned to Dr. Hodous, who further debrided the lesion on his foot. Plaintiff was to apply lotion to keep the problem from recurring. (Tr. at 445.)

On November 4, 2008, plaintiff returned to Dr. Black, doing much better, sitting and moving comfortably. He was to follow-up if problems occurred. (Tr. at 443.)

On January 6, 2009, plaintiff saw Dr. Hodous, who debrided plaintiff's foot lesion and applied acid. (Tr. at 441.) Plaintiff returned on January 29, and Dr. Hodous again debrided the lesion and retreated it with Salicylic acid. (Tr. at 439.)

On August 18, 2009, plaintiff saw Dr. Hoang Vu at Advanced Pain Management regarding left abdominal and left lower back pain, on referral from Dr. Sokhi. He rated the abdominal pain 3/10 at best and 10/10 at worst. He stated that the pain was aggravated by lying down, sitting, standing, and eating, relieved by medication and changing positions. Physical therapy provided no change. The onset of abdominal pain was gradual and started in 2006. Plaintiff also rated the back pain as 3/10 at best, 10/10 at worst, and currently 3/10. He stated that the pain was aggravated by standing, sitting, and walking, relieved by lying down and medication. The onset of this pain was also gradual and without injury, starting in 2007. (Tr. at 499.) He complained of no vomiting, diarrhea, or nausea, but did complain of abdominal pain and constipation. On physical exam, Dr. Vu noted no cervical spine tenderness, but some tenderness in the left lumbar area, with mildly reduced range of motion. (Tr. at 500.) Plaintiff's "Oswestry score" was 38 out of 60, indicating severe functional impairment.[6] Dr. Vu diagnosed

---

[6]The Oswestry Low Back Pain Disability Index utilizes a patient questionnaire containing six statements (denoted by the letters A through F) in each of ten sections. The questions

pain, abdominal, unspecified site; facet joint pain, lumbosacral; chronic pancreatitis; and low back pain; adjusted plaintiff's medications; and scheduled a left side L3-4-5 medial branch block ("MBB"). (Tr. at 501.) Plaintiff returned to Dr. Vu on September 1 to re-assess his medications, stating that they worked well and kept his pain under control. He noted no adverse side effects. He continued to have axial back pain, and Dr. Vu was awaiting approval for a lumber MBB. (Tr. at 504.)

On September 6, 2009, plaintiff was admitted to the hospital for diabetic ketoacidosis ("DKA"), which doctors treated aggressively with IV fluid re-hydration. (Tr. at 494-96.) Plaintiff's symptoms improved, and he was discharged home on September 8, with the medication Lantus, a long-acting insulin, and told to follow-up with the diabetic educator and instructor. (Tr. at 497-98.)

Plaintiff returned to Dr. Vu on September 29, 2009, noting his recent hospitalization and diagnosis with diabetes. Regarding his pain, he was doing well on his current medications. However, he continued to have axial lower back pain. The lumbar MBB had been approved, so Dr. Vu set that up. (Tr. at 507.) Dr. Vu performed the MBB on October 8, with plaintiff tolerating the procedure well. Dr. Vu prescribed Baclofen and continued plaintiff's other medications. (Tr. at 510-11.) Plaintiff returned to Dr. Vu on October 28, reporting 30% relief from the procedure. Given the positive test, Dr. Vu proceeded with a second MBB, which

---

concern impairments like pain, and the ability to cope with such things as personal care, lifting, reading, driving, and recreation. For each section, the patient chooses the statement that best describes their status. The designers of the test interpret "percentage of disability" scores in this manner: 0% to 20% = minimal disability; 20% to 40% = moderate disability; 40% to 60% = severe disability; 60% to 80% = crippled; and 80% to 100% = bed bound (or exaggerating symptoms). MacDonald v. Astrue, No. 06-10815, 2007 WL 1051507, at *2 n.4 (D. Mass. Apr. 4, 2007).

plaintiff also tolerated well.  Dr. Vu continued his medications.  (Tr. at 512.)

**B.    SSA Consultants' Reports**

The SSA, through a state agency, arranged for plaintiff's claim to evaluated by several consultants.  On July 19, 2007, Roger Rattan, Ph.D, completed a psychiatric review technique form, finding no severe mental impairment.  (Tr. at 265.)  Specifically, Dr. Rattan found only mild limitation in plaintiff's activities of daily living (ADL's) and concentration, persistence and pace; no difficulty in maintaining social functioning; and no episodes of decompensation.  (Tr. at 275.)  On November 27, 2007, Dr. Dar Muceno completed a physical RFC report, finding plaintiff capable of light work, with no additional limitations.  (Tr. at 404-11.)  And on November 29, 2007, Eric Edelman, Ph.D., completed a psychiatric review technique form, finding that plaintiff suffered from a severe affective disorder and substance addiction disorder, which caused moderate limitations in ADL's, social functioning, and concentration, persistence, and pace, but with no episodes of decompensation.  (Tr. at 412-22.)  In an accompanying mental RFC report, Dr. Edelman found moderate limitations in plaintiff's ability to carry out detailed instructions, maintain concentration for extended periods, perform activities within a regular schedule, complete a normal workday without interruptions from psychological symptoms, accept instruction and criticism, and respond appropriately to changes in the work setting, but no significant limitation in all of the other areas listed on the form.  (Tr. at 426-28.)

**C.    Hearing Testimony**

On September 24, 2009, plaintiff appeared with counsel before the ALJ, Christopher Skarda.  The ALJ also summoned a VE to the hearing.  (Tr. at 1.)

15

### 1. Plaintiff

Plaintiff testified he was thirty-six years old, 5'10" and 234 pounds. (Tr. at 6.) He stated that he was unmarried and had five children, ranging in age from five to eighteen, none of whom lived with him. (Tr. at 7.) He testified that he lived alone, and that his mother drove him to the hearing as his driver's license was suspended. (Tr. at 7.) He had completed the eleventh grade in school, had not obtained a GED, and had no additional vocational training. (Tr. at 8.) He testified that he last worked in 2004 as a general laborer for a temporary agency. (Tr. at 8-9.) His last non-temporary job was as a warehouse worker for Target in 2002 or 2003. (Tr. at 9-10.) He testified that he left that job because he could not tolerate the pain associated with standing all day. (Tr. at 11.) He also referenced a manufacturing job for a company that made refrigerators in 2003 and 2004. (Tr. at 11.) He testified that he was fired from that job. (Tr. at 12.) He also worked as a waiter in a hotel in 2000 and 2001, being fired from that job due to absences, and as a cafeteria worker from 1990 to 1992. (Tr. at 12.)

Plaintiff listed a disability onset date of July 1, 2006, stating that he selected that date because, after several hospitalizations due to pancreatitis, that time "it really struck." (Tr. at 13.) When asked why he could not work, he answered chronic pain (Tr. at 13) and sleep problems (Tr. at 15) related to his pancreatitis (Tr. at 14).[7] He also testified that he was disabled due to depression, which made him want to avoid other people, and diabetes, which was not well-controlled and had recently led to a hospitalization. (Tr. at 14.) Plaintiff testified that he took medication for pain, including Hydrocodone and (within the past month) morphine.

---

[7]Plaintiff's counsel later asked him if he experienced any nausea or vomiting related to the pancreatitis, and plaintiff answered: "When I don't eat or sometimes because of the medicine." (Tr. at 41.)

(Tr. at 15.)  Prior to going on the morphine, he rated his pain a 4 or 5 on a 1-10 scale.  (Tr. at 18.)  He stated that he even with the morphine, his pain rated 4 or 5.  He testified to a side effect of drowsiness with the Hydrocodone and morphine.  (Tr. at 19-20.)

Plaintiff testified that he saw Dr. Sohki every three months for pancreatitis.  (Tr. at 20-21.)  He received no treatment for that condition other than pain medication.  (Tr. at 21.)  He testified that he was diagnosed with depression in 2007 (Tr. at 21) and took Fluoxetine and Xanax (Tr. at 23).  He indicated that he had just recently been diagnosed with Type II diabetes.  (Tr. at 25.)  He took Trazodone and Ambien to help with sleep.  (Tr. at 35.)  Because of problems sleeping at night he took daily naps of one to two hours.  (Tr. at 41.)  Finally, plaintiff testified that he also had HIV, which added to his fatigue and for which he took the medication Atripla, which also caused drowsiness and fatigue.  (Tr. at 41-42.)

Plaintiff testified that he could walk about ½ block, stand ten to fifteen minutes, and sit about fifteen minutes before experiencing pain.  (Tr. at 26.)  He also complained of pain when bending or kneeling.  (Tr. at 27.)  He testified that sometimes his fingers locked up, which the pain management doctor attributed to muscle spasms.  He stated that he could lift about ten pounds.  (Tr. at 28.)  He testified that he did some chores around the house, dishes and cleaning, depending on how he felt; he indicated that his symptoms waxed and waned daily.  (Tr. at 29.)  He testified that he otherwise did little other than watching TV and walking to the end of the block and back once per day.  (Tr. at 29-30, 37-38.)  He had no hobbies and did not exercise.  (Tr. at 31.)  He recently went to Peoria, Illinois, about a three hour drive, for his grandmother's funeral.  (Tr. at 31.)  He testified that he had a girlfriend, who cooked meals for him, but no other friends in Sheboygan where he lived.  About once a month he visited his mother in Milwaukee.  (Tr. at 33.)  Plaintiff testified that he had been sober for about two years

and attended weekly AA meetings in Sheboygan. (Tr. at 35.) He testified that he looked for work with a temp service due to financial problems, but he was never selected for an assignment. (Tr. at 39.) He testified that he could not do a sit-down job due to pain from the pancreatitis. (Tr. at 40.)

### 2. VE

The VE, Jacquelyn Wenkman, identified plaintiff's past work history as a warehouse worker as heavy, unskilled work; waiter, as light, unskilled; assembler, as medium, unskilled work; stocker, medium, unskilled; and concession and cafeteria worker, light, unskilled. (Tr. at 45-46, 47.) The ALJ then asked a series of hypothetical questions, the first assuming a person of plaintiff's age, education and work experience, able to perform the full range of light work, but limited to simple, routine, repetitive tasks. (Tr. at 46-47.) The VE opined that such a person could perform plaintiff's past work as a waiter and concession attendant or cafeteria worker. (Tr. at 47.) If the person was limited to sedentary work, with a sit/stand option, and simple, routine, repetitive work, all of plaintiff's past jobs would be eliminated, but the person could perform other jobs, such as sedentary assembly work, with about 3900 such jobs existing in Wisconsin. (Tr. at 48.) The person could also work as a lobby attendant, with 2079 such jobs in Wisconsin, or video surveillance monitor, with 320 of those jobs in Wisconsin. (Tr. at 48-49.) If the ALJ added the requirement of low stress work, i.e., only occasional decision-making, only occasional changes in the work setting, and only occasional supervision, the person could still work as a bench assembler, surveillance monitor, or attendant. (Tr. at 49-50.)

The VE testified that employers generally permit unskilled workers to take two ten to fifteen minute breaks, and one thirty to forty-five minute break in the middle of the shift. Such employers would tolerate less than two absences per month. (Tr. at 51.) More than eighteen

18

absences in a year would eliminate all work for a person of plaintiff's age, education, and work experience. (Tr. at 52.) Likewise, if the person required breaks of an hour or more, all work would be eliminated. (Tr. at 53.) Finally, if, due to pain and mental impairments, the person could not sustain work activity on a regular and continuing basis for a full-time work schedule, all work would be eliminated. (Tr. at 53.)

## D.    ALJ's Decision

The ALJ, following the five-step procedure, determined that plaintiff had not worked since July 1, 2006, the alleged disability onset date, and that he suffered from the severe impairments of pancreatitis, poly-substance abuse, diabetes, depression, HIV, hypertension, and liver disease, none of which met or equaled a listed impairment. (Tr. at 68.) The ALJ then determined that plaintiff retained the RFC for sedentary work, with the following additional limitations: a sit/stand option; work that is simple, routine, and repetitive; low stress work (only occasional decision making and/or changes in the work setting); and work that is isolated with only occasional supervision. (Tr. at 69.) In making this determination, the ALJ considered plaintiff's testimony and statements, finding that while plaintiff was "generally credible," he "appeared to exaggerate his symptoms, especially his pain and fatigue." (Tr. at 72.) The ALJ also considered Dr. Sokhi's report limiting plaintiff to sub-sedentary work, but for various reasons gave it "little weight." (Tr. at 71.)

Based on this RFC, and relying on the VE's testimony, the ALJ concluded that plaintiff could not perform his past work but could do other jobs, such as bench assembly (3900 jobs), attendant (2079 jobs), and video surveillance (320 jobs). (Tr. at 72-73.) The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 74.)

19

## III.  DISCUSSION

In this court, plaintiff alleges two errors: (1) the ALJ violated the "treating source rule" in considering Dr. Sokhi's report, and (2) the ALJ improperly evaluated the credibility of plaintiff's testimony.  I address each argument in turn.

## A.    Treating Source Opinion

### 1.    Applicable Legal Standard

Under SSA regulations, the opinion of a disability claimant's treating physician, if "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the case record, will be given "controlling weight." 20 C.F.R. § 404.1527(d)(2); SSR 96-8p; Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011); Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  If the record contains well-supported contrary evidence, the presumption in favor of the treating source opinion falls out, and the ALJ determines the weight to give the opinion by considering a checklist of factors, Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008); Hofslien, 439 F.3d at 377, including (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention tending to support or contradict the opinion, 20 C.F.R. § 404.1527(d)(2).  Regardless of the weight the ALJ elects to give the treating source opinion, he must always "give good reasons" for his decision.  20 C.F.R. § 404.1527(d)(2); see also

<u>Punzio</u>, 630 F.3d at 710 ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision.").

## 2. Analysis

Here, the ALJ provided several reasons for giving Dr. Sokhi's report "little weight." (Tr. at 71.) First, Dr. Sokhi listed symptoms of recurrent nausea and vomiting, but plaintiff never mentioned these problems during his testimony until his lawyer reminded him. Second, Dr. Sokhi listed few symptoms – radiation of abdominal pain to the back, in addition to the nausea and vomiting – yet still limited plaintiff to sub-sedentary work. Third, Dr. Sokhi suggested that plaintiff cannot have public contact, yet he treated plaintiff only for pancreatitis and HIV, not any mental impairments. (Tr. at 71.) Fourth, Dr. Sokhi failed to mention that plaintiff's hospitalizations for pancreatitis had always been related to his drinking. (Tr. at 71-72.) Finally, Dr. Sokhi opined that plaintiff would miss more than four days of work per month but provided no reasons for that opinion. (Tr. at 72.) The ALJ also cited the state agency consultants' reports finding plaintiff capable of light work physically and not significantly limited in his ability to carry out simple instructions, sustain an ordinary routine, work in coordination with others without being distracted by them, and make simple work-related decisions. (Tr. at 71.)

Plaintiff argues that the ALJ violated the treating source rule by providing his own reasons for giving Dr. Sokhi's report little weight rather than specifically addressing the factors set forth in § 404.1527(d)(2). It is true that the regulation requires the ALJ to consider those six factors, but his decision need only include "good reasons" for the weight given to the treating source's opinion rather than "an exhaustive factor-by-factor analysis." <u>Francis v. Commissioner Social Sec. Admin.</u>, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. Mar. 16, 2011); <u>see also</u> <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites

no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); Brown v. Barnhart, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) ("ALJs are not required to produce prolix opinions containing checklists from all of the regulations."). In any event, the ALJ in this case generally covered the ground of § 404.1527(d)(2). The ALJ noted that Dr. Sokhi saw plaintiff since 2002 on an as-needed basis (Tr. at 71); he discussed plaintiff's treatment history (Tr. at 70-71); he compared the restrictions set forth in Dr. Sokhi's report with the other evidence in the record, medical and testimonial (Tr. at 71); and he noted that Dr. Sokhi treated plaintiff for physical problems, yet opined on mental restrictions, an area outside his expertise (Tr. at 71).

Plaintiff argues that a proper application of the factors articulated in the regulation leads to the conclusion that Dr. Sokhi's opinion should be afforded great weight. But it is not the role of the court on § 405(g) review to re-weigh the evidence. See Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). Plaintiff further argues that the ALJ cited no evidence contrary to Dr. Sokhi's opinion, but that is incorrect. The ALJ cited the state agency consultants' reports, the hospital records showing that plaintiff experienced severe problems only when he drank too much, and plaintiff's own testimony.

Plaintiff contends that the ALJ provided no evidence that he does not suffer from nausea and vomiting, but that too is incorrect. As the ALJ noted, plaintiff never mentioned these symptoms on direct questioning by the ALJ, but only after prompting by his lawyer. Even then plaintiff stated that he experienced nausea or vomiting: "When I don't eat or sometimes because of the medicine." (Tr. at 41.) He did not describe a severe, continuous problem that would preclude all work.

Plaintiff also argues that there is no evidence in the record suggesting that his

abdominal/back pain is not as severe as he claims it to be, noting that he takes a number of narcotic pain medications. But the ALJ did not dispute that plaintiff suffered from some pain and limitation; he simply disagreed that the pain could reasonably require the very severe restrictions Dr. Sokhi imposed. In this vein, the ALJ cited a medical record from September 5, 2008, where plaintiff was noted to be sober for over a year, doing very well, and reporting good pain control with his medications. (Tr. at 72; 453-54.) Similarly, in September 2009, plaintiff reported that his pain medications worked well and kept the pain under control. (Tr. at 71; 504.) The ALJ further noted plaintiff's normal lumbar x-rays and relatively normal exam findings. (Tr. at 71; 468, 470.)

Plaintiff defends Dr. Sokhi's restriction from public contact, noting that Dr. Sokhi is a medical doctor with whom he's had a longstanding treatment relationship. Be that as it may, it was not unreasonable for the ALJ to consider Dr. Sokhi's lack of expertise in this area in considering the weight to give his opinion.

Finally, plaintiff notes that Dr. Sokhi opined that he would continue to experience disabling symptoms even if he maintained absolute sobriety. Plaintiff contends that this undercuts the ALJ's conclusion that Dr. Sokhi's opinion should be given little weight because the doctor failed to recognize that all of plaintiff's pancreatitis attacks were associated with heavy drinking. However, as the ALJ noted, the medical records do not support Dr. Sokhi's contention about plaintiff's sobriety. The records showed that plaintiff experienced no hospitalizations after he quit drinking and that he seemed to do much better.

In sum, the ALJ provided a sound explanation for rejecting the severe restrictions in Dr. Sokhi's report. There is accordingly no basis for reversal or remand on this ground.

**B.      Credibility**

**1.      Applicable Legal Standard**

Under SSR 96-7p, the ALJ must follow a two-step process in evaluating the credibility of a social security claimant's testimony.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  If there is no medically determinable physical or mental impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's pain or other symptoms, the symptoms cannot be found to affect his ability to work. SSR 96-7p.

Second, if the ALJ finds that the impairment(s) could produce the symptoms alleged, he must determine the extent to which the symptoms limit the claimant's ability to work.  SSR 96-7p.  In making this determination, the ALJ may not discredit the claimant's statements based solely on a lack of support in the medical evidence.  Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009).  Rather, the ALJ must consider the entire record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  The ALJ must then provide "specific reasons" for the credibility determination, supported by the evidence and articulated in the decision. SSR 96-7p.  So long as the ALJ substantially complies with these requirements – and in recognition of the ALJ's opportunity to personally observe the claimant testifying – the reviewing court will afford his

credibility determination special deference, reversing only if it is "patently wrong."  See, e.g., Jones, 623 F.3d at 1160; Castile, 617 F.3d at 929.

**2. Analysis**

Here, after setting forth the two-step test from SSR 96-7p (Tr. at 69-70), the ALJ found that plaintiff "was generally credible, but appeared to exaggerate his symptoms, especially his pain and fatigue." (Tr. at 72.)  The ALJ provided several reasons for this finding.  First, the ALJ noted that at the beginning of the hearing plaintiff's answers were slow and measured, but later in the hearing his recall was quicker, suggesting exaggeration.  Second, plaintiff admitted that his pancreatitis waxed and waned, yet he inconsistently claimed to be in constant pain.  Third, the ALJ noted a treatment record from September 5, 2008, indicating that plaintiff had been sober for a year and was doing very well.  Plaintiff stated that he was on Vicodin for his chronic pancreatitis, which kept his pain under control.  Fourth, the ALJ noted that although plaintiff received some treatment between 2006 and 2009, there were multiple visits where pancreatitis was not even mentioned.  Fifth, the ALJ noted plaintiff's history of alcohol and drug abuse, yet plaintiff had never been in any type of treatment, and never following up after detox; he had also been advised several times by his doctors not to drink, yet continued to do so.  The ALJ also noted that plaintiff had been in jail for six months, from November 2006 to May 2007, for a probation violation.  Sixth, the ALJ noted that plaintiff's medications had been relatively effective in controlling his symptoms; plaintiff admitted that his pain rated a 4 or 5 (on a 0-10 scale) when taking his medication and had improved in the past month with a new prescription. Finally, the ALJ noted that plaintiff's daily activities – attempting to work, vacuuming, doing dishes, visiting his mother, traveling to Peoria – were not as limited as one would expect given his complaints of disabling symptoms.  (Tr. at 72.)

Plaintiff argues that the ALJ improperly discounted his testimony because of his past alcohol and drug abuse and prior criminal history. The ALJ did not make substance abuse a material issue, see 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."), so, plaintiff contends, it was impermissible for the ALJ to use that as a basis to find that he was exaggerating his symptoms.

Had plaintiff's past substance abuse and brushes with the law been the only reasons the ALJ provided for finding his claims exaggerated, I would tend to agree with plaintiff's request for reversal and remand. While a claimant's inconsistent statements about his alcohol or substance abuse may rightfully cast doubt on his credibility, see, e.g., Williams v. Astrue, 371 Fed. Appx. 877, 879 (9th Cir. 2010) (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 884 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002)), it is improper to generally discount a claimant's testimony simply because he drank too much in the past, see, e.g., Lavallee v. Astrue, No. 3:09-CV-1996, 2011 WL 49582, at *1 (D. Conn. Jan. 6, 2011) ("The court would be remiss if it did not note that the ALJ seems to have placed great weight – perhaps excessive weight – on plaintiff's alcohol abuse in the distant past and his continued cigarette smoking as reasons for discounting his credibility, as well as that of his treating sources as to the severity of his limitations. Alcoholism is not a character defect, nor is it a persuasive indicium of incredibility."). The ALJ in this case made no finding that plaintiff lied about his substance abuse, or that the effects of plaintiff's alcohol abuse, e.g., poor memory, cast doubt on this testimony. Nor did he find that plaintiff would not be disabled if he stayed sober. Nor did the ALJ explain why plaintiff's jail stint made him less credible. Cf. Fed. R. Evid.

609 (providing that certain criminal convictions may be introduced to attack a witness's truthfulness).

However, the ALJ provided other reasons for his credibility determination, consistent with the SSR 96-7p factors, which plaintiff does not contest and which the court can follow. As set forth above, the ALJ noted that despite plaintiff's claim at the hearing that he suffered from severe, constant pain due to his pancreatitis, treatment records suggested that he was doing well, with his medications keeping his pain under control. See Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) ("Contrary to any claim of severity, the ALJ concluded that at best Skinner had demonstrated nondisabling symptoms, and the record medical evidence established that those symptoms are largely controlled with proper medication and treatment."). On numerous doctor visits, he said nothing at all about pain related to pancreatitis. The ALJ further noted that plaintiff's daily activities exceeded what one would expect given plaintiff's complaints of disabling symptoms. See Berger v. Astrue, 516 F.3d 539, 545-46 (7th Cir. 2008) (affirming where the claimant's activities and work attempt cut against his claims of total disability). The ALJ also relied on plaintiff's demeanor at the hearing, a finding entitled to special deference in this court. See Kelley v. Sullivan, 890 F.2d 961, 964 (7th Cir. 1989) ("Credibility findings are reserved for the ALJ, in part because the ALJ is able to observe the witness.").

Finally, it is important to note that the ALJ did not totally reject plaintiff's claims and found him more limited than the SSA consultants. Considering the testimony and the medical evidence, the ALJ determined that plaintiff was limited to sedentary work with a sit/stand option due to his physical impairments. The ALJ further determined that, due primarily to the side effects of his medication (along with his mental impairments), that plaintiff was limited to low stress, isolated, simple, routine, repetitive work. (Tr. at 72.)

In sum, while "the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'" <u>Simila</u>, 573 F.3d at 517. Therefore, the decision must stand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision **AFFIRMED**, and this case is **DISMISSED**. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of April, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

28